Ted A. Berkowitz
Louis A. Scarcella
Darren A. Pascarella
FARRELL FRITZ, P.C.
1320 RXR Plaza
Uniondale, New York 11556-1320
Tel:    (516) 227-0700
Fax:    (516) 227-0777

*Attorneys for the Official*
*Committee of Unsecured Creditors*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x
                                        :
In re:                                  :       Chapter 11
                                        :
DEWITT REHABILITATION AND               :       Case No. 11-10253 (ALG)
NURSING CENTER, INC.,                   :
                                        :
                        Debtor.         :
-----------------------------------------------------------x

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS TO THE DEBTOR'S APPLICATION FOR A FINAL
ORDER AUTHORIZING THE DEBTOR TO UTILIZE CASH COLLATERAL
OF METROPOLITAN NATIONAL BANK AND ISRAEL DISCOUNT
BANK OF NEW YORK AND GRANTING ADEQUATE PROTECTION
<u>AND RELATED RELIEF PURSUANT TO 11 U.S.C. §§ 105, 361 AND 363</u>**

TO THE HONORABLE ALLAN L. GROPPER,
UNITED STATES BANKRUPTCY JUDGE:

The Official Committee of Unsecured Creditors (the "<u>Committee</u>") of DeWitt Rehabilitation and

Nursing Center, Inc. (the "<u>Debtor</u>"), hereby submits its objection (the "<u>Objection</u>") to the Debtor's

application, pursuant to sections 105, 361 and 363 of Title 11 of the United States Code (the "<u>Bankruptcy

Code</u>"), seeking entry of a final order (the "<u>Final Order</u>") (I) authorizing the Debtor to utilize the cash

collateral of Metropolitan National Bank and Israel Discount Bank of New York (collectively, the

"<u>Lenders</u>") and (II) granting adequate protection and related relief (the "<u>Application</u>").  In support of this

Objection, the Committee respectfully states as follows:

# INTRODUCTION

1.     The proposed final cash collateral order seeks to provide the Lenders with rights and protections that are inappropriate and unnecessary under the facts and circumstances of this Chapter 11 case. While the Committee strongly supports the Debtor's proposed use of cash collateral and does not oppose granting the Lenders appropriate protections, the Lenders' Final Order (as defined herein) is disjointed and, if entered, would grant the Lenders significantly more entitlements than are appropriate in a cash collateral order of the form routinely entered in chapter 11 cases, which is what should be entered in this case.

2.     During the past few months, the Committee discussed with the Lenders its concerns with the Interim Order (as defined herein) and the Lenders' Final Order and sought to negotiate revisions which would result in a consensual final order. Unfortunately, nearly all of the revisions requested by the Committee have to date been rejected by the Lenders.

3.     The Committee believes that material modifications need to be made to the Lenders' Final Order, not only as to its content, but also as to its structure. Attached hereto as **Exhibit A** is the Committee's proposed final cash collateral order (the "Committee's Final Order"). The Committee's Final Order clarifies the confusion caused by the Lenders' Final Order and would adequately protect the Lenders from any potential diminution in value of their prepetition collateral, while at the same time providing the Debtor the protections necessary to reorganize in a manner which maximizes the value of its estate and does not limit the Committee from exercising its statutory powers nor limit this Court's ability to oversee this case. A few of the key modifications proposed by the Committee include:[1]

    a.   Eliminate the Lenders' imposition of direct payment obligations upon the Debtor and maintaining the Debtor's payment obligations to PropCo under the Lease;

    b.   Include a provision that provides for a Carve-Out for the payment of (i) fees to the Clerk of the Bankruptcy Court and to the US Trustee; and (ii) accrued and unpaid fees and expenses of the Patient Ombudsman and of the Professionals;

    c.   Modify certain burdensome and unreasonable Events of Default, which as drafted provide for no notice or ability to cure;

---

[1] Additional important modifications to the Lenders' Final Order are described herein.

       d.   Modify the notice period terminating the Debtor's use of Cash Collateral consistent with Local Rule 4001-2(c)(2);

       e.   Eliminate certain onerous restrictions on the Committee's standing and ability to pursue claims against the Lenders;

       f.   Eliminate the provision precluding the Debtor from seeking the non-consensual use of the Cash Collateral;

       g.   Eliminate the provisions stating that the Interim Order is modified by the terms of the final order. The final order should supersede the terms of the Interim Order;

       h.   Include a provision stating that the payment of Lenders' fees, costs and expenses should be without prejudice to the ultimate application of such payments in accordance with the Bankruptcy Code;

4.     As of the time of submission of this Objection, the Lenders' Final Order had not been filed on the ECF docket. A copy of the Lenders' Final Order that was provided to the Committee on April 25, 2011 (the "Lenders' Final Order") is attached hereto as **Exhibit B**.

## BACKGROUND

5.     On January 25, 2011 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtor continues to operate its business and manage its property as debtor in possession. No trustee or examiner has been appointed in the Debtor's Chapter 11 case.

6.     On February 3, 2011, the Committee was appointed by the United States Trustee for this Region (the "US Trustee") pursuant to § 1102 of the Bankruptcy Code. On April 21, 2011, the Court entered an order authorizing the employment and retention of Farrell Fritz, P.C. as counsel for the Committee, effective as of February 10, 2011.

7.     On the Petition Date, the Debtor filed the Application. On February 2, 2011, the Court entered an order (the "Interim Order") authorizing the Debtor to use, on an interim basis, cash collateral in which the Lenders assert an interest. The term of the Interim Order has been extended by subsequent orders of the Court.

8.     The Interim Order was entered in this Chapter 11 case before the Committee was appointed by the US Trustee. Shortly after appointment of the Committee and selection of its counsel, the

Committee advised the Debtor and the Lenders of its objections to the terms and conditions of the Debtor's use of cash collateral under the Interim Order. The Committee followed up on these initial discussions with a memorandum, dated March 18, 2011, setting forth comments to the Interim Order that the Committee sought to have addressed in a final order. Rather than file an immediate objection, the Committee sought to consensually resolve its objections to the Interim Order and continued discussions with the Lenders regarding the Debtor's use of cash collateral under a final order.

9. On April 25, 2011, the Lenders sent the Lenders' Final Order to the Committee. After receipt of the Lenders' Final Order, the Committee contacted the Lenders to discuss its objections. Its objections, in large part, were the same objections the Committee had to the Interim Order. The parties had several discussions and, at the request of the Lenders, on May 25, 2011, the Committee sent a memorandum to the Lenders setting forth issues that required further discussion. Despite the Committee's requests, it was not until June 23, 2011 that the Lenders engaged in a discussion with the Committee regarding the memorandum the Committee sent on May 25, 2011. All of the revisions requested by the Committee, however, were rejected by the Lenders.

## OBJECTION

10. The Committee objects to the Lenders' Final Order because it includes certain provisions which, in the context of this case, are unreasonable, overreaching and otherwise inappropriate.[2] In addition, the Lenders' Final Order is disjointed and causes confusion. The objectionable provisions of the Lenders' Final Order, which are addressed consecutively herein, are as follows:

**A.     The Definition of "Pre-Petition Financing Agreements" Causes Confusion**

11. In describing the agreements that establish the relationships, rights and obligations of the parties, the Lenders' Final Order does not distinguish between the agreements the Lenders entered into with PropCo, on the one hand, from the agreements they entered into with the Debtor, on the other hand. *See* Lenders' Final Order ¶ (i), pp. 6-7. The Lenders' Final Order describes all of the transaction

---

[2] All capitalized terms used but not defined herein shall have the meanings ascribed to them in the Lenders' Final Order.

agreements between the parties in one paragraph and defines all of those agreements as the "Pre-Petition Financing Agreements". As the final order will address the Debtor's use of the Cash Collateral in which Lenders' assert an interest, and the Lenders' asserted interest in the Cash Collateral is established by the agreements between the Lenders and the Debtor, those agreements should be described and defined separately from the agreements the Lenders entered into with PropCo. Defining all of the transaction agreements as the "Pre-Petition Financing Agreements" causes unnecessary confusion throughout the Lenders' Final Order. *See, e.g.,* Lenders' Final Order ¶ (ii), p. 7; ¶ (iii), p. 7; ¶ (vii), pp. 9-10; § 3(b).

12. As set forth in the Committee's Final Order, the agreements between PropCo and the Lenders and the Debtor and the Lenders should be described and defined separately to provide clarity to the final order and to avoid confusion. *See* Committee's Final Order ¶¶ E(a) and (b).

**B.     The Definition of "Pre-Petition Obligations" Causes Confusion**

13. The Lenders define the "Pre-Petition Obligations" as "the aggregate amount of all loans and other pre-petition obligations owing to Lenders under the *Pre-Petition Financing Agreements* …" Lenders' Final Order ¶ (ii), p. 7 (emphasis added). This definition not only includes all amounts owed by the Debtor to the Lenders, but also includes all amounts owed by PropCo to the Lenders. As does the definition of "Pre-Petition Financing Agreements", the Lenders' definition of "Pre-Petition Obligations" causes unnecessary confusion throughout the Lenders' Final Order. *See, e.g.,* Lenders' Final Order ¶ (iii), p. 7; ¶ (v)(ii), p. 8; § 3(c).

14. The definition of "Pre-Petition Obligations" should be limited to the obligations owed by the Debtor to the Lenders. Although the amount of the obligations owed by the Debtor to the Lenders may be the same as the amount of the obligations owed by PropCo to the Lenders, separating the Debtor's obligations from that of PropCo, as done in the Committee's Final Order, provides clarity and avoids confusion. *See* Committee's Final Order ¶ E(c).

### C. The Pre-Petition Obligations Should Not Automatically Constitute An Allowed Secured Claim of the Lenders

15.     Pursuant to paragraph (v)(iii) on page 8 of the Lenders' Final Order, if the Committee does not seek to challenge the Lenders' claims and liens or is unsuccessful in such a challenge, the Pre-Petition Obligations will constitute an allowed *secured* claim of the Lenders. *See* Lenders' Final Order ¶ (v)(iii), p. 8. The Lenders, however, should not automatically be granted a secured claim for the full amount of the Pre-Petition Obligations because the Lenders may be undersecured. Instead, the Lenders should be required to demonstrate that the Pre-Petition Obligations are fully secured.

16.     Thus, rather than automatically granting the Lenders an allowed secured claim in the amount of the Pre-Petition Obligations, the Lenders should only be granted an allowed claim in the amount of the Pre-Petition Obligations as proposed in the Committee's Final Order. *See* Committee's Final Order § 9(i).

### D. The Lenders' Final Order Incorrectly Describes the Lease With PropCo

17.     The Lenders' Final Order describes an Agreement of Lease between the Debtor and PropCo, dated as of January 1, 2003, and describes the Debtor's monthly payment obligations to PropCo under the Lease as "in an amount equal to any and all payments, fees, charges and the like as and when due [to] all fee mortgagees … of [Propco] in connection with any fee mortgage financing arrangement by and between [PropCo] and any [such lender]". *See* Lenders' Final Order ¶ (vi), p. 9.

18.     The descriptions of the Lease and the Debtor's monthly payment obligations in the Lenders' Final Order are incorrect. PropCo and the Debtor entered into an Agreement of Lease, dated as of January 1, 2002, as amended by an Amendment to Lease dated October 28, 2004. Further, although the Lease obligates the Debtor to pay PropCo the amounts necessary for PropCo to make the monthly debt service payments, property tax payments, insurance and other payments (in each case as provided therein) to Lenders, the Debtor is also obligated to pay PropCo an additional amount equal to 25% of the amounts PropCo is obligated to pay to Lenders. The Committee's Final Order corrects these errors. *See* Committee's Final Order ¶ E(e); § 3.

**E. The Lenders' Final Order Does Not List the Alleged Events of Default**

19.     In paragraph (vii), pages 9-10 of the Lenders' Final Order, the Lenders allege that certain events of default have arisen under the Pre-Petition Financing Agreements, but fail to specifically describe those events of default.  *See* Lenders' Final Order ¶ (vii), pp. 9-10.  The final order should specifically describe the alleged events of default by the Debtor, especially since it is an "Event of Default" under Lenders' Final Order if the Debtor defaults under any of the terms, provisions and conditions of the Pre-Petition Financing Agreements.  *See* Lenders' Final Order § 13(g); *see also Id.* at § 3(b)(ii).

**F. The Final Order Should Supersede the Interim Order**

20.     As proposed, the terms of the Lenders' Final Order will merely modify the terms of the Interim Order.  *See* Lenders' Final Order §§ 1, 24.  The Interim Order should not be modified by the final order.  Rather, it should be superseded by the final order.  The terms and conditions of the final order will encompass all of the rights and obligations of the parties with respect to the Debtor's use of the Cash Collateral.  Having to refer to both the Interim Order and the final order to determine the rights and obligations of the parties will add unnecessary confusion, which could result in unnecessary litigation and increased costs and expenses to the estate.  *See, e.g.,* Lenders' Final Order §§ 3, 4.

21.     The Committee's Final Order specifically provides that the final order supersedes the Interim Order, which will avoid unnecessary confusion as this case proceeds.  *See* Committee's Final Order § 18.

**G. The Concept of a "Cash Collateral Settlement Agreement" Causes Confusion And Is Unnecessary**

22.     The Lenders' Final Order uses the defined term "Cash Collateral Settlement Agreement" to refer to the terms and conditions governing the Lenders' ongoing consent to the Debtor's use of the Cash Collateral.  *See* Lenders' Final Order § 3.  The use of this defined term will merely cause confusion and is unnecessary because the Debtor's use of the Cash Collateral is governed by the terms of the final

order.  Accordingly, the concept of a "Cash Collateral Settlement Agreement" should be removed from the final order.

**H.      The Debtor Has No Direct Payment Obligations To the Lenders**

23.      The Lenders' Final Order would require, if entered, the Debtor to make monthly payments *to the Lenders* in the amount due by PropCo to Lenders under the Promissory Note and other Pre-Petition Financing Agreements, which payments are to be applied to the Pre-Petition Obligations. *See* Lenders' Final Order § 3(a).

24.      The Debtor has no direct payment obligations to the Lenders (but does have direct payment obligations to PropCo under the Lease) and the Lenders should not be permitted to impose such obligations as a condition to usage of Cash Collateral.  Further, the Debtor's monthly Lease payments to PropCo should be applied to the current amounts due under the Lease – not to the Pre-Petition Obligations as proposed by the Lenders.

25.       Except as may otherwise be agreed to between the Debtor and PropCo, the Debtor should timely pay all amounts, including rent, due under the Lease, and timely perform all its other obligations under the Lease in full satisfaction of the requirements of section 365(d)(3) of the Bankruptcy Code.  *See* Committee's Final Order § 3.

26.      Since the Lease seems to be little more than a conduit for the payment by the Debtor of PropCo's monthly obligations to the Lenders, all amounts paid by the Debtor under the Lease in excess of the amounts necessary for PropCo to make monthly debt service payments (which shall include interest at the non-default rate), property tax payments and insurance should be deposited in a newly established bank account of the Debtor and such funds should not be disbursed from such account except upon further order of this Court.  *See Id.*

27.      If the Lease is recharacterized as a financing, all of the excess Lease payments could be retained by the Debtor.  The Committee plans to investigate this issue, but has concerns about preserving the *status quo* in the interim.  In the meantime, the Committee requests that this Court escrow the excess Lease payments and not permit such amounts to fall into the hands of PropCo.

**I.     The Debtor's Payment of Deferred Principal Should Be Paid to PropCo to Satisfy Its Obligations Under the Lease and Should Not Be Contingent Upon PropCo's Performance**

28.     The Lenders' Final Order obligates the Debtor to pay to the Lenders the amount of the deferred principal payments due under the PropCo Promissory Note for the four month period January 2011 to April 2011 upon the happening of certain events, including "the occurrence or continuance of any event of default or default under the Lease or the Pre-Petition Financing Agreements ..." *See* Lenders' Final Order § 3(b).

29.     First, for the reasons set forth in Section H, *supra*, the Debtor should pay the amount of the deferred payments to PropCo, not to the Lenders, to satisfy its obligations under the Lease and section 365(d)(3) of the Bankruptcy Code, as proposed by the Committee's Final Order. *See* Committee's Final Order § 4(d)(vii).

30.     In addition, since the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on January 25, 2011, the Debtor should only be required to pay the *pro rata* portion of rent that came due in January 2011, i.e., the period of January 25, 2011 through January 31, 2011, rather than the full amount due under the Lease for the month of January 2011. *See Id.*

31.     Finally, because the definition of the Pre-Petition Financing Agreements encompasses the agreements between the Lenders and PropCo, any default by PropCo, even a non-material default, will obligate the Debtor to pay the Lenders the deferred principal payments or suffer an Event of Default under the Final Order and the termination of its right to use the Cash Collateral. The Debtor's obligation to pay the deferred principal payments (and, potentially, its ability to continue operations) should not be contingent upon PropCo's performance.

32.     Accordingly, section 3(b) of the Lenders' Final Order should be modified as proposed in the Committee's Final Order. *See* Committee's Final Order § 4(d)(vii).

**J.     The Debtor Should Not Pay For An Appraisal of the Mortgaged Premises**

33.     The Lenders' Final Order requires the Debtor to pay for an "appraisal of the collateral securing the Pre-Petition Obligations". Lenders' Final Order § 3(c). Since the definition of the "Pre-

Petition Obligations" includes all amounts owed by PropCo to the Lenders, *see Id.* at ¶ (ii), p. 7, and because the Mortgage Premises secures PropCo's indebtedness to the Lenders, section 3(c) of the Lenders' Final Order would require the Debtor to pay for an appraisal of the Mortgaged Premises.

34.     The Debtor should only be required to pay for an appraisal of its assets that are held as security by the Lenders, as proposed by the Committee's Final Order.  *See* Committee's Final Order § 4(d)(v).  If the Lenders desire an appraisal of the Mortgaged Premises, PropCo, as owner of the Mortgage Premises, and not the Debtor, should be required to pay for the appraisal.

**K.     The Debtor's Payment of Lenders' Fees, Costs and Expenses**

35.     The Lenders' Final Order requires the Debtor to pay the Lenders' fees, costs and expenses (including the Lenders' legal fees and expenses).  *See* Lenders' Final Order § 3(d).

36.     To the extent that the Lenders are oversecured, then the Committee has no objection to the use of Cash Collateral to satisfy the Lenders' claim for fees, costs and expenses.  Although the Debtor has not yet provided a valuation, the Committee has no reason to believe that the Lenders are not adequately secured.  However, to the extent that the Lenders are undersecured, the Lenders are not entitled to reimbursement of their fees, costs and expenses.

37.     Therefore, payment of fees, costs and expenses of the Lenders should be without prejudice to the ultimate application of such payments in accordance with the Bankruptcy Code, including, without limitation, section 506(b) of the Bankruptcy Code.  *See* Committee's Final Order § 4(c).

**L.     The Debtor Should Not Be Required to Enter Into the Forbearance Agreement**

38.     The Lenders' Final Order requires the Debtor to enter into the Forbearance Agreement with the Lenders as a condition to its use of Cash Collateral.  *See* Lenders' Final Order § 3(e).

39.     The Committee objects to the Debtor entering into the Forbearance Agreement because there is no need for it to do so.  The final order will (i) govern the terms and conditions pursuant to which the Debtor may use the Cash Collateral and (ii) adequately protect the Lenders' alleged interest in the Pre-Petition Collateral.  Having to refer to both the Forbearance Agreement and the final order to determine

the rights and obligations of the parties will add unnecessary confusion, which could result in unnecessary litigation and increased costs and expenses to the estate. Further, the Debtor will derive no benefit from the Lenders' agreement to forbear from pursuing their rights and remedies under the Pre-Petition Financing Agreements because the automatic stay of § 362 of the Bankruptcy Code is in effect.

40.     If it is the Lenders' desire to enter into a forbearance agreement with PropCo, the Committee has no objection to the extent that such an agreement does not prejudice the rights of the Debtor and the Committee in any way, or affect, in any way, the administration of the Debtor's estate.

**M.      Adequate Protection of the Lenders' Interest In the Pre-Petition Collateral**

41.     From the text of the Lenders' Final Order, it is evident that the Lenders either misconstrue the concept of adequate protection under section 361 of the Bankruptcy Code, or they are attempting to gain significantly more entitlements than are appropriate in this case. Either way, the provisions governing the grant of adequate protection to the Lenders in the Committee's Final Order are clear, adequate and should govern.

42.     The purpose of providing adequate protection is to insure that a prepetition secured creditor receives the value for which it bargained for prior to the commencement of the bankruptcy case. *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987); *In re Worldcom, Inc.*, 304 B.R. 611, 618-619 (Bankr. S.D.N.Y. 2004). Adequate protection functions only to safeguard a secured creditor from diminution in the value of its interest during the chapter 11 case. *In re Mosello*, 195 B.R. 277, 288 (Bankr S.D.N.Y. 1996). If adequate protection is required, it may be provided by, among other things, cash payments, additional liens, replacement liens and the indubitable equivalent of such entity's interest in such property. 11 U.S.C. § 361.

      **a.       The adequate protection granted to the Lenders should be derived solely from the terms of the final order, and if Lenders seek additional adequate protection, any party should be permitted to contest the relief sought**

43.     The Lenders' Final Order states that the Lenders shall be granted adequate protection as provided for in the final order *and the Interim Order*, and "shall be without prejudice to the Lenders' right to seek additional adequate protections from this Court." *See* Lenders' Final Order § 4 (emphasis added).

44. As set forth in Section F, *supra*, the final order should not supplement the Interim Order, but, rather, should supersede the Interim Order. The adequate protection of the Lenders' alleged interest in the Pre-Petition Collateral should be fully set forth in the final order to avoid the confusion that may arise by referring to both orders. Providing clarity to the final order will prevent unnecessary litigation in this case and the increased costs and expenses to the estate associated therewith. *See* Committee's Final Order § 4(f).

45. With respect to the provision of the Lenders' Final Order deeming the grant of adequate protection to be without prejudice to the Lenders' right to seek additional protections from the Court, the Committee has no objection. However, the Committee asked the Lenders to incorporate into the final order a similar provision – "and without prejudice to the right of the Debtor, the Committee or any other party in interest to contest any such modification." *Id.* The Lenders refused to do so.

46. If the final order specifically states that the grant of adequate protection is without prejudice to the Lenders' rights to seek additional protections, it should also specifically state that it is without prejudice to any party in interest to contest any such modification. *See Id.*

**b.    The provision granting Lenders a superpriority claim is confusing, overreaching and not subject to a carve-out**

47. The provision in the Lenders' Final Order dealing with the Lenders' 507(b) claim is, in the first instance, confusing, and otherwise overreaching. *See* Lenders' Final Order § 5. It proposes to grant the Lenders a 507(b) claim, defined as the "Adequate Protection Claim".

48. The Adequate Protection Claim should not arise automatically. Rather, the Lenders should be granted a superpriority claim only if they demonstrate, and to the extent of, any diminution in the value of the Lenders' interest in the Pre-Petition Collateral resulting from (x) the use of the Cash Collateral pursuant to section 363(c) of the Bankruptcy Code, (y) the use, sale, lease, depreciation, or other diminution in value of the Prepetition Collateral (other than the Cash Collateral) pursuant to section 363(c) of the Bankruptcy Code and (z) the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code.

49.     Further, the Lenders' 507(b) claim should be subject to a carve-out for the payment of (i) fees required to be paid to the Clerk of the Bankruptcy Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code; and (ii) fees and expenses of the patient care ombudsman and of professionals retained by the Debtor, the Committee and the patient care ombudsman (the "Carve-Out").[3]  *See* Committee's Final Order §§ 5, 8.

50.     In addition, the final order should preclude payment of the Adequate Protection Claim from the proceeds arising from any successful action by the Committee against directors and/or officers of the Debtor, including but not limited to the proceeds of any director and officer liability insurance policy (collectively, the "D&O Action Proceeds").  The D&O Action Proceeds should be shared by the body of general unsecured creditors of the Debtor because they would be the class of creditors that was harmed the most by any malfeasance of the Debtor's officers and/or directors.  As such, it is entirely equitable for the Court to preclude payment of the Adequate Protection Claim from the D&O Action Proceeds.  *See Id.* at § 5.

51.     Finally, although the Lenders' Final Order attempts to preclude payment of the Adequate Protection Claim from the proceeds of Avoidance Actions, the provision is confusing.[4]  Clarity should be brought to this provision especially since the Interim Order provides that the Lenders' 507(b) claim could be paid from the proceeds of Avoidance Actions.  *See* Interim Order § 5.

52.     Section 5 of the Committee's Final Order clarifies the confusion caused by the Lenders' Final Order while providing for a superpriority claim, subject to an appropriate carve-out, if the Lenders demonstrate, and to the extent of, any diminution in the value of the Lenders' interest in the Pre-Petition Collateral.  *See* Committee's Final Order § 5.

---

[3] As discussed in Section R, *infra*, the Lenders' Final Order does not, but should, provide for a Carve-Out.
[4] "…; provided, that, such priority under Section 507(b) shall not extend to any assets recovered on behalf of the Debtor's estate pursuant to Sections 542, 544, 545, 547, 548, 549 or 550 of the Bankruptcy Code."  Lenders' Final Order § 5.

c. **The provision granting the Adequate Protection Lien to Lenders is confusing, too expansive and not subject to a carve-out**

53. The Lenders Final Order grants the Lenders an "Adequate Protection Lien", as security for the Adequate Protection Claim, in the Pre-Petition Collateral and the Post-Petition Collateral to the extent that the Pre-Petition Collateral is utilized by the Debtor. *See* Lenders' Final Order § 6.

54. First, the replacement security interests and liens are not granted as security for the Adequate Protection Claim, i.e., the Lenders' potential 507(b) claim. Rather, the replacement security interests and liens are granted (in the Post-Petition Collateral) to the extent of any actual diminution in the value of the Lenders' interest in the Pre-Petition Collateral.

55. Further, adequate protection should not be granted in order to enhance a secured creditor's position. As such, the Lenders should not be granted security interests and liens in the Post-Petition Collateral *and* the Pre-Petition Collateral "to the extent that the Prepetition Collateral is utilized by the Debtor". *See* Lenders' Final Order § 6. Rather, the Lenders should be granted replacement security interests and liens (i) solely in the Post-Petition Collateral (of the same type as the Pre-Petition Collateral); (ii) only to the extent of any actual diminution in the value of the Lenders' interest in the Prepetition Collateral; and (iii) to the same extent and validity as the Lenders' prepetition liens and security interests. *See* Committee's Final Order § 4(a).

56. In addition, the final order should provide that (i) the payments to be made by the Debtor to PropCo under the final order do not constitute diminution in the value of the Pre-Petition Collateral (because such payments are actually enhancing the value of the Pre-Petition Collateral), and (ii) the use of Cash Collateral in accordance with the Budget does not create the presumption of diminution or non-diminution in the value of the Prepetition Collateral. *See Id.* at § 4(e).

57. Finally, the Lenders' "Adequate Protection Lien" should (i) be subject to the Carve-Out; (ii) not extend to (a) the D&O Action Proceeds, (b) the Avoidance Actions or any monies or other property recovered in connection with the successful prosecution or settlement of Avoidance Actions or

(c) any funds received by the Debtor from New York State, or any agency thereof, arising out of or relating to rebasing (Medicaid) and mitigation relief benefit, or otherwise. *See Id.* at §§ 4(a), 6.

58.     The Committee's Final Order clarifies the confusion caused by the Lenders' Final Order while providing the Lenders with replacement security interests and liens, subject to an appropriate carve-out, in the Post-Petition Collateral (in each case to the same extent and validity as the Lenders' prepetition liens and security interests) if the Lenders demonstrate, and to the extent of, any diminution in the value of the Lenders' interest in the Pre-Petition Collateral. *See Id*.

**N.      Onerous Limitations on the Committee's Standing and Ability to Pursue Claims Against the Lenders Should be Stricken from the Final Order**

59.     The Lenders' Final Order limits the rights of the Committee to commence any action against the Lenders.  Specifically, section 9 of the Lenders' Final Order only permits the Committee "to bring any appropriate proceeding with regard to the Debtor's stipulation … to the validity, perfection, enforceability, priority and non-avoidability of Lenders' claim and liens, and the lack of any defense thereto."  Lenders' Final Order § 9.  Similarly, section 3(f) of the Lenders' Final Order limits the type of proceeding the Committee may commence against the Lenders. *See Id.* at § 3(f).

60.     The Committee's ability to commence *any* proceeding against the Lenders should not be limited, particularly in light of the fact that the Debtor has already waived its right to commence any such proceeding.  The Committee should be allowed to commence any proceeding against the Lenders (the "Challenges") including, but not limited to, those in relation to the validity, enforceability or priority of the Pre-Petition Obligations or the Lenders' liens on the Pre-Petition Collateral in respect thereof, or otherwise asserting any claims or causes of action against the Lenders on behalf of the Debtor's estate. *See* Committee's Final Order § 9.

61.     Further, the Lenders have refused to include in the Lenders Final Order language that explicitly provides standing to the Committee to pursue the Challenges, even though the Debtor has already waived its right to bring any Challenges.  The absence of such a provision would force the Committee to consume valuable time to draft, file and litigate a standing motion.  The Committee

believes that it is a better use of the time of the Committee and this Court to include a standing provision in the final order, particularly since the Committee has become the sole fiduciary charged with the responsibility of investigating and bringing such causes of action.

62.     Finally, the final order should provide the Committee with the opportunity to apply to this Court to extend the time in which it may bring any Challenges.

63.     The Committee's Final Order removes the onerous limitations on the Committee's standing and ability to pursue claims against the Lenders.  *See Id.*

**O.     The Lenders Should Be Subject to the Equitable Doctrine of Marshalling**

64.     Section 11 of the Lenders' Final Order will, automatically upon entry, entitle the Lenders to be exempt from marshalling with respect to the collateral securing the Pre-Petition Obligations (which includes the Mortgaged Premises).  *See* Lenders' Final Order § 11.  Neither the Debtor nor the Lenders have produced any evidence to demonstrate that the Lenders should receive such favorable treatment. The Committee submits that they should not.

65.     Upon information and belief, the value of the Mortgaged Premises far exceeds the Pre-Petition Obligations.  In order to provide unsecured creditors with any hope of recovery in the event of the liquidation of the Debtor's estate, the Lenders should be required to first seek to satisfy the Pre-Petition Obligations from the Mortgaged Premises.

66.     Accordingly, the provision exempting the Lenders from the doctrine of marshalling should be stricken from the final order.

**P.     The Debtor Should Not Be Precluded From Seeking the Non-Consensual Use of the Cash Collateral**

67.     The Lenders' Final Order seeks to forbid the Debtor from seeking entry of any further orders in this case authorizing the use of Cash Collateral "[s]o long as the Adequate Protection Claim remain outstanding …".  *See* Lenders' Final Order § 12.

68.     First, it is not yet known whether the Lenders have an Adequate Protection Claim.  As described in Section M(b), *supra*, the Lenders' superpriority claim will only arise if they demonstrate, and to the extent of, any diminution in the value of the Lenders' interest in the Pre-Petition Collateral.

69.     Further, if the Debtor's ability to use the Cash Collateral pursuant to the final order terminates, the Debtor should not be forced to cease its operations.  Rather, the Debtor should be permitted to apply to the Court to use the Cash Collateral on a non-consensual basis.  The Court should be free to fashion any remedy that is appropriate under the circumstances as contemplated by the Committee's Final Order.  *See* Committee's Final Order § 15.

**Q.     Events of Default and the Termination of Debtor's Use of Cash Collateral**

70.     Section 13 of the Lenders' Final Order sets forth the list of Events of Default and section 14 deals with termination of the Debtor's ability to use Cash Collateral.  *See* Lenders' Final Order §§ 13, 14.

**a.     Some of the Events of Default Should Be Eliminated or Modified**

71.     The list of Events of Default as provided in the Lenders' Final Order is too expansive. Among others, an Event of Default arises if "any plan of reorganization or liquidation of the Debtor is confirmed which does not provide for the payment in full in cash of the Debtor's pre-petition and post-petition obligations to Lenders unless otherwise agreed to with Lenders …"  Lenders' Final Order § 13(c).

72.     Such an Event of Default may be appropriate in a DIP financing order, but not in a cash collateral order.  It is also inappropriate for at least two other reasons.  First, if the value of Lenders' secured claim is less than full amount of the Pre-Petition Obligations, the Debtor should not have to pay Lenders in full pursuant to any plan.  In addition, this provision appears to deprive the Debtor of the opportunity to negotiate any plan other than one that pays Lenders in full at confirmation.  The Debtor should not be bound by such a provision in the final order.

73. Another Event of Default arises if there is "non compliance or default by the Debtor with any of the terms, provisions and conditions of the final order or the Pre-Petition Financing Agreements …" *Id.* at § 13(g).

74. This Event of Default creates conditions for the Lenders to declare an Event of Default in situations where non-material events have transpired in this case and could effectively give the Lenders discretion to continue or terminate this Chapter 11 case at their whim. In order to protect the Debtor from non-material defaults under the final order or the agreements it entered into with the Lenders, only a "material" default in the Debtor's obligations under the final order or under the Prepetition Secured Debt Documents (defined in the Committee's Final Order at ¶ E(b)) should trigger an Event of Default.

75. The Committee's Final Order provides numerous safeguards to the Lenders in respect of events of default while, at the same time, protecting the Debtor from non-material defaults and providing the Debtor with the opportunity to negotiate a plan in this case. *See* Committee's Final Order § 7.

**b.      The Lenders Should Provide Notice of *Any* Alleged Event of Default**

76. The only instance in which the Lenders propose to provide notice of an alleged Event of Default is for non-compliance or default by the Debtor under the final order or the Pre-Petition Financing Agreements. *See* Lenders' Final Order § 13(g). Further, the Lenders' Final Order provides that "said non-compliance or default [under § 13(g)] shall not be deemed an Event of Default if curable and cured by the Debtor within two (2) business days after notice of such non-compliance or default is provided …" *Id.*

77. The final order should require the Lenders to provide notice of *any* alleged Event of Default to the parties listed in § 13(g) and should afford a cure period of not less than five (5) business days from the delivery of any such notice. *See* Committee's Final Order § 7. Providing notice of any alleged Event of Default will allow the Debtor an opportunity to either attempt to cure an alleged Event of Default, to seek an emergency hearing for the purpose of determining whether a valid Event of Default has occurred or seek any other appropriate relief related to the Debtor's continued use of Cash Collateral. As a practical matter, the Debtor would need to know when the Lenders allege an Event of Default

because its authority to use the Cash Collateral would immediately terminate if such event is (i) not curable or (ii) cured within two days of the occurrence thereof.  *See* Lenders' Final Order § 14.

### c.    The Lenders' Final Order Violates Local Bankruptcy Rule 4001-2(c)(2)

78.    The Lenders' Final Order states that "[i]f any Event of Default under this Final Order is (i) not curable or (ii) cured within two (2) days of the occurrence thereof, the Debtor's authorization to use of Cash Collateral shall immediately cease."  *See* Lenders' Final Order § 14.

79.    This provision offends the practical business realities of a chapter 11 enterprise, as well as Local Bankruptcy Rule 4001-2(c)(2), which provides that:

> If the proposed order contains a provision that terminates the use of cash collateral, either *the proposed order shall require at least five days' notice before the use of cash collateral ceases . . .* or the motion shall explain why such notice provision is not contained in the proposed order.

Local Bankruptcy Rule 4001-2(c)(2) (emphasis supplied).  The Application does not explain why such notice provision is not contained in the Lenders' Final Order.

80.    In order to comply with Local Bankruptcy Rule 4001-2(c)(2) and to provide the Debtor sufficient time either to attempt to cure an alleged Event of Default or to seek an emergency hearing before this Court, the Committee proposes a cure period of not less than five (5) business days from the delivery of any notice of an Event of Default.  *See* Committee's Final Order § 7.

### R.    The Final Order Must Provide A Carve-Out

81.    The Lenders' Final Order does not provide for a carve-out for the payment of (i) fees required to be paid to the Clerk of the Bankruptcy Court and to the US Trustee under section 1930(a) of title 28 of the United States Code; and (ii) accrued and unpaid fees and expenses of a patient care ombudsman appointed under section 333 of the Bankruptcy Code (the "Patient Ombudsman") and of professionals retained by the Debtor, the Committee and the Patient Ombudsman (the "Professionals").

82.    The absence of a carve-out from the Lenders' Final Order will limit the Committee's ability to acquit its fiduciary obligations to the Debtor's unsecured creditors in accordance with § 1103 of the Bankruptcy Code, and force the Professionals to finance this chapter 11 case.  *See, e.g., In re*

*Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (stating that "failure to provide a reasonable sum for professionals has, in other cases before this Court, left estates, creditors' committees and trustees without the assistance of counsel and the Court without the adversary system contemplated by Congress.").

83.     For a chapter 11 case to be administered properly, statutory fiduciaries must be represented by qualified professionals who are equipped to represent the interests of their clients. Without a mechanism in place to ensure that the Professionals will be compensated for their services, the statutory fiduciaries, including the Committee, will be severely disadvantaged and will be unable to perform their statutorily defined duties.

84.     Accordingly, the Committee submits that the Court should require the inclusion of an appropriate Carve-Out as proposed in the Committee's Final Order.  *See* Committee's Final Order § 8.

**S.      Miscellaneous Objections**

85.     The Lenders should not have the uninhibited right to visit and inspect the Debtor's property and examine and make extracts from its books and records as proposed in the Lenders' Final Order.  *See* Lenders' Final Order § 16.  Rather, any inspection undertaken by the Lenders should be conducted in a manner that does not interfere with the Debtor's normal business operations.  *See* Committee's Final Order § 4(d)(vi).

86.     Section 17 of the Lenders' Final Order is devoted to the definition of the word "Proceeds".  *See* Lenders' Final Order § 17.  As this defined term is not used elsewhere in the Lenders' Final Order, this section is meaningless and should be stricken from the final order.

87.     Section 18 of the Lenders' Final Order states that "nothing in this Final Order shall discharge or otherwise impact, and *the Committee hereby expressly reserves*, all rights, claims and remedies of the Debtor as against Propco."  Lenders' Final Order § 18 (emphasis added).  The Committee cannot reserve the Debtor's rights as against PropCo.  Rather, it is the Debtor's estate reserving its rights as against PropCo.  *See* Committee's Final Order § 16.

88. Section 19 of the Lenders' Final Order states that "[t]he terms and conditions of this Final Order shall be … (ii) not be stayed absent an application by a party in interest for such stay in conformance with such Fed. R. Bankr. P. 8005 …" *See* Lenders' Final Order § 19. This provision is objectionable because the terms of the final order would be stayed upon the mere filing of an application for such a stay. Any such application seeking a stay of the terms and conditions of the final order should be granted before the final order is stayed. In any event, there is no need for such a provision in the final order. *See* Committee's Final Order § 17.

89. Section 20 of the Lenders' Final Order refers to "other claims and Liens granted by this Order". *See* Lenders' Final Order § 20; *see also Id.* at § 10. The only claims and liens granted by the final order are the Adequate Protection Claim and the Adequate Protection Lien. As such, the term "other claims and Liens" should be stricken from the final order. Further, Section 20 of the Lenders' Final Order refers to the "Adequate Protection Obligations", although that term is not defined in the Lenders' Final Order. *See Id.* at § 20.

90. Section 23 of the Lenders' Final Order directs the Debtor to serve a copy of the final order on, among others, the Chairman of the Committee and the twenty largest unsecured creditors. *See* Lenders' Final Order § 23. Rather than serve the Chairman of the Committee and the twenty largest unsecured creditors, the final order should provide for service on counsel for the Committee.

91. Section 24 of the Lenders' Final Order provides that "[t]o the extent of any conflicts or inconsistencies between the terms or provisions of the Interim Order, on the one hand, and this Final Order, on the other hand, the terms and provisions of this Final Order shall control and govern." Lenders' Final Order § 24. As set forth in Section F, *supra*, the final order should supersede the Interim Order to avoid unnecessary confusion as this case proceeds. *See* Committee's Final Order § 18.

## CONCLUSION

WHEREFORE, the Committee respectfully requests that the Court (a) sustain its Objection to the Application; (b) enter the Committee's Final Order in the form of the document attached hereto as

**Exhibit A**; and (c) grant the Committee such other and further relief as the Court deems just and appropriate.

Dated:  Uniondale, New York
       July 8, 2011

                                    FARRELL FRITZ, P.C.

By:     *s/ Darren A. Pascarella*
        Ted A. Berkowitz
        Louis A. Scarcella
        Darren A. Pascarella
        1320 RXR Plaza
        Uniondale, New York 11556-1320
        Tel:    (516) 227-0700
        Fax:    (516) 227-0777

        *Attorneys for the Official Committee of Unsecured Creditors*

Interwoven\1842697.2